**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 21-cv-2477

**ALEXANDRA BARBOUR,
BRIANNA BARBER,
JESSICA BEVERAGE,
ROBERT HARR,
CHRISTOPHER HOLLAND,
NALINA INFANTE,
CODY SCHMITT, and
ALEX WOLFSON,**

       Plaintiffs,

v.

**THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation, and
DOES 1-100, in their individual capacities,**

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

       Plaintiffs, listed above, by and through their counsel of record, BEEM & ISLEY, P.C., and

BAUMGARTNER LAW, LLC, respectfully submit this Complaint against the Defendants, and

allege and aver as follows:

### JURISDICTION AND VENUE

       1.     This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the First, Fourth

and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28

U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.      The Plaintiffs, identified individually in greater detail below, are citizens of the State of Colorado who were present, nearby, observing, participating in, and/or otherwise associated with peaceful protests in Denver, Colorado, on various dates starting from May 28, 2020, and going into the month of July 2020.

4.      Defendant, The City and County of Denver (the "City"), is and was at all relevant times a Colorado municipal corporation with final policy-making authority over the Denver Police Department ("DPD") and its police officers.

5.      At all relevant times, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.  The City was also responsible for the actions of officers from other law enforcement agencies from whom the City requested assistance.

6.      Defendants, Does 1 through 100, are and were at all relevant times officers, employees, and/or agents of the DPD or officers of other agencies or jurisdictions who were acting under color of state law and within the course and scope of their agency or employment with and/or the authorization of the DPD, and who violated the clearly established constitutional rights of Plaintiffs as alleged more fully below.  Plaintiffs do not currently know the true names and capacities of the Defendants sued herein as Does 1 through 100, inclusive, and therefore sue these

Defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.  The individual Doe Defendants are sued in their individual capacities and are hereinafter referred to as the "Defendant Officers" or "Denver Police Officers" or "Denver Police."

7.      Upon information and belief, the Defendant Officers are citizens of the State of Colorado.

8.      All Defendants are responsible in some manner for the damages and injuries alleged in this Complaint.

9.      At all relevant times, the acts and omissions of the Defendant Officers were pursuant to the customs, policies, practices, procedures, supervision, and training of the City and the DPD.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND
### *Plaintiffs' Activities and Injuries*

10.     The Plaintiffs are all individuals who attended, observed, were associated with, and/or documented peaceful protests in Denver, Colorado, between the dates of May 28, 2020, and July 19, 2020, in response to officer-involved killings nationwide, in particular, the then-recent killings of George Floyd on May 25, 2020, and Breonna Taylor on March 13, 2020, and other injustices by law enforcement.

11.     As alleged in greater detail below, each of the Plaintiffs was injured in some way after being targeted, shot at, gassed, and/or fired upon, either indiscriminately as part of a group or specifically by the Defendant Officers because of their participation in, support of, observation or

documentation of, and/or association with the peaceful protests and demonstrations against police misconduct and brutality.

12.     At the time the Plaintiffs were injured and/or arrested by the Defendant Officers, none of the Plaintiffs was rioting, committing any act of violence or aggression, threatening the police or others, or violating any law.   At all relevant times, the Plaintiffs were peacefully exercising their constitutional First Amendment rights to free speech, association, and/or documentation of public demonstrations.

13.     The injuries and damages caused to Plaintiffs were caused both by the individual unconstitutional actions of the uniformed officers, and by the customs, policies, practices, and lack of proper training and supervision of the City.

### *Plaintiff Alexandra Barbour*

14.     Alexandra Barbour is a resident of Colorado.

15.     On May 31, 2020, Ms. Barbour attended a peaceful protest in Denver, Colorado, with several of her friends.

16.     Denver Police Officers approached Ms. Barbour as she was kneeling as a non-threatening symbol of peaceful protest.

17.     Ms. Barbour began to retreat and when she turned her back to leave the area, police officers shot her in the right ankle with a rubber bullet or other hard projectile.

18.     As a result, Ms. Barbour suffered physical injuries to her right ankle and is suffering from post-traumatic stress disorder.  Ms. Barbour required medical treatment for her injuries.

19.     Ms. Barbour is also too afraid to attend peaceful protests and her First Amendment rights have been effectively chilled.

### *Plaintiff Brianna Barber*

20.     Brianna Barber is a resident of Colorado.

21.     On May 30, 2020, Ms. Barber attended the peaceful protest in downtown Denver to protest police brutality in the wake of the death of George Floyd.

22.     Around 2:30 p.m., a large group of peaceful protesters, including Ms. Barber, marched to the Denver Police Station.

23.     Once peaceful protesters arrived at the station, Denver Police Officers, without warning, started shooting tear gas, rubber bullets, and flash-bang grenades indiscriminately into the crowd.

24.     Ms. Barber ran to escape the attack.  In so doing, she observed a group of teenage girls who had become trapped inside of a fenced area, and who were huddled together while a group of Denver Police Officers continually shot them in the back with pepper balls and rubber bullets.

25.     Because the young girls were panicking and obviously being injured, Ms. Barber pushed her knee through a space in the fence so that these girls could use her knee as a step to climb over the fence to escape their attackers.

26.     The attacking officers then specifically aimed and fired at Ms. Barber.  While helping these girls, Ms. Barber suffered multiple contusions on her right leg in addition to suffering eye and face burns from tear gas and chemicals.

27.     Ms. Barber then went to Civic Center Park to provide aid to any people who had been wounded.

28.     While in the Park, the Denver Police stormed the park, shooting rubber bullets, tear gas canisters, and flash-bang grenades indiscriminately into the crowd.

29.     When Ms. Barber raised her hands in a peaceful "don't shoot" gesture, Denver Police Officers specifically targeted her and shot her with rubber bullets. They also specifically targeted the protest sign that she was holding above her head.

30.     Ms. Barber then fled to the Capitol grounds to escape the barrage of projectiles, but officers began shooting rubber bullets indiscriminately into the crowd there as well.

31.     Once on the Capitol grounds, Ms. Barber was surrounded by Denver Police.

32.     While Ms. Barber had her hands up in the air, a Denver Police Officer pepper-sprayed Ms. Barber from head to toe. Her body was completely covered by orange chemical spray, and she experienced intense pain from being pepper-sprayed at close range all over her body.

33.     Ms. Barber was shot multiple times throughout the day while her hands were in the air. Ms. Barber sustained five contusions to her body from being shot with rubber bullets. Because of the pain, she was unable to sleep for several nights.

34.     When Ms. Barber was washing the pepper spray residue off her body, the chemicals got into orifices and sensitive areas, causing excruciating pain for several days. It took multiple days to remove all the spray from her body.

35.     The residual chemicals from the pepper spray on her body caused burning sensations and breathing issues to her children if they got too close to her. Thus, Ms. Barber could not be around her children until the residue was gone. As a single mother, this further complicated her recovery.

36.     Ms. Barber had continuous ringing in her ears from the flash-bang grenades which lasted for several days.  She also experienced depression with associated difficulty in caring for herself and her children, requiring psychological therapy and counseling, a significant modification in her menstrual cycle and treatment for severe menstrual cramping since the incidents, and has been intimidated from exercising her First Amendment Rights to free speech.

### *Plaintiff Jessica Beverage*

37.     Jessica Beverage is a resident of Colorado.

38.     On May 31, 2020, Ms. Beverage was at the State Capitol Building in Denver, Colorado, with a group of peaceful protesters who had formed a line in front of Denver Police officers.

39.     Without provocation, Denver Police deployed tear gas at the group of protesters, including Ms. Beverage.

40.     As the tear gas was deployed, Ms. Beverage tried to escape the toxic gas by running away, but as she ran, she was shot in the back with a tear-gas canister by police officers.

41.     The canister lodged in a helmet, which was attached to her backpack, and melted the plastic on her helmet, fusing the canister to the helmet as it spewed toxic gas.

42.     The gas burned Ms. Beverage's eyes and skin and caused her to vomit almost instantly as she fell to the ground.

43.     Citizen medics were eventually able to remove the canister from her helmet, at which point they doused Ms. Beverage with milk to counteract the burning in her eyes and on her skin.

44.     On July 1, 2020, Ms. Beverage returned to Civic Center Park in Denver to participate in a peaceful protest.

45.     Denver Police eventually arrived at the park, and without first giving any dispersal order or giving the protesters any time to gather their belongings and leave the park, Denver Police rushed into the park in full riot gear.

46.     Ms. Beverage joined a line of people as a non-violent, passive means of resistance to police aggression.  Denver Police then began pushing and hitting peaceful protesters with their batons to break the line which had formed.

47.     When the protestors dispersed and started leaving in compliance with police orders, the officers began indiscriminately shooting protestors with tear gas canisters and pepper balls and spraying them with Mace.

48.     As Ms. Beverage was attempting to render aid to another protester and trying to remove the protester from the protest area, a Denver Police Officer sprayed Mace directly in Ms. Beverage's face from a short distance away.

49.     Ms. Beverage was badly injured by this attack, went into shock, and began shaking uncontrollably.

50.     Ms. Beverage was covered in pepper-spray as a result of the Denver Police actions, including her face, eyes, mouth, and clothes.  She was not able to wear her contact lenses for several days after the incident, and she was also unable to fully wash the paper-spray from her skin even after taking multiple showers.  As a result, her skin burned for several days after the incident.

51.     Ms. Beverage had to seek medical treatment for capsaicin poisoning caused by the pepper spray.

52.     Ms. Beverage is now fearful of attending community events and peaceful protests, and her First Amendment rights have been effectively chilled by the actions of the DPD and its officers.

### *Plaintiff Robert Harr*

53.     Robert Harr is a resident of Colorado.

54.     On July 1, 2020, Mr. Harr traveled to downtown Denver, Colorado, to help as a medic to those injured while protesting police brutality, the death of George Floyd, and the removal of the homeless population and the confiscation of their property.

55.     Around 11:00 p.m., Denver Police Officers began to drive along the border of Civic Center Park, ordering protestors to leave.  Mr. Harr also observed officers in riot gear gathering in formation.

56.     Peaceful protesters, including Mr. Harr, formed a line around the medic tent to preserve supplies which had been used to help injured protesters and the homeless populations near the park.

57.     Denver Police Officers then entered the park in riot gear and began pushing and hitting peaceful protesters with their batons to break the line the protesters had formed.  Police also deployed tear gas and smoke bombs at the peaceful protesters, including Mr. Harr.

58.     Mr. Harr, who was in front of the line, was sprayed directly in his face with pepper spray by the officers.  One police officer violently punched him in his diaphragm with the end of the officer's baton, knocking Mr. Harr to his knees.

59.     The Denver Police Officers arrested Mr. Harr even though he told the officers that he was there as a medic.

60.     In the course of arresting him, the police officers twisted his arm almost to the point of breaking it and would not let him get medical supplies out of his bag so that he could wash the pepper spray out of his eyes.

61.     Mr. Harr was arrested and charged with curfew infraction and failure to obey.  Mr. Harr was acquitted of the charge for failure to obey and found guilty of the curfew infraction.

62.     Despite his pleas that he was in pain from the chemicals covering his face and body, Mr. Harr was not allowed to wash off the chemicals for the entire eight hours he was in custody.

63.     Mr. Harr suffered injuries from the chemical sprays and the extreme twisting of his arm, and he sought treatment for his injuries after being released.

### Plaintiff Christopher Holland

64.     Christopher Holland is a resident of Colorado.

65.     On May 29, 2020, Mr. Holland traveled to downtown Denver to peacefully protest police brutality and the death of George Floyd.

66.     Mr. Holland marched with other peaceful protesters who were holding up signs and chanting slogans peacefully.

67.     Denver Police Officers shot Mr. Holland's wrist with a rubber bullet or other hard projectile as he peacefully marched holding a sign above his head, indicating that the officers were aiming and firing hard projectiles at the level the protesters' heads.

68.     The hard projectile caused a large, highly visible contusion on Mr. Holland's wrist with pain and swelling that lasted for several weeks.

69.     Mr. Holland was also shot in the legs with pepper-balls which left bruises on his legs and markings on his pants.

70.     Mr. Holland sought medical attention for the wrist injury and was diagnosed with a bone contusion.  Mr. Holland continues to have wrist pain and soreness with limited range of motion and fatigue after prolonged use.  As a result, he now uses a wrist brace.

*Plaintiff Nalina Infante*

71.     Nalina Infante is a resident of Colorado.

72.     On May 28, 2020, Ms. Infante went to downtown Denver, Colorado, to peacefully protest police brutality and the death of George Floyd.

73.      Ms. Infante was peacefully protesting near the State Capitol building where fencing provided both distance and a physical barrier between the protesters and the police, and there was no threat posed to the officers.

74.     However, Denver Police arrived in full riot gear and began firing pepper balls and tear gas canisters into the crowd.  It created a thick cloud of gas which pushed peaceful protesters, including Ms. Infante, back into the street on Colfax.  After the protestors were in the street, the police again fired hundreds of pepper balls relentlessly and indiscriminately into the crowd.

75.     Ms. Infante experienced severe burning and stinging all over her body from the amount of tear gas and pepper ball chemicals that filled the air around her.  Her skin, eyes, and throat were burning which made her choke and cough, making it hard for her to breath.

76.     On Saturday May 30, 2020, Ms. Infante returned to downtown Denver to again participate in peaceful protests at the State Capitol building.

77.     While Ms. Infante was peacefully protesting, the Denver Police, in full riot gear, began relentlessly and indiscriminately firing pepper balls, rubber bullets, pepper spray, and flash-bang grenades into the crowd of peaceful protestors, which included Ms. Infante.

78.     When Ms. Infante attempted to put traffic cones over tear-gas canisters that were fired into the crowd to prevent the gas from harming other protesters, the Denver Police fired whatever ammunition they had at her, striking her dozens of times and leaving many large and painful bruises all over her body.

79.     At another point when Ms. Infante was running to extinguish a tear-gas canister, police shot her on the upper part of her left thigh near her hip with a rubber-bullet.  The pain from being hit by this projectile disoriented Ms. Infante, and she collapsed.

80.     As a result of this incident, walking was extremely painful for Ms. Infante which made performing any of her work duties excruciating.

81.     Ms. Infante sought medical treatment and was diagnosed with a severe hematoma and contusion with significant internal bleeding.

82.     Within two weeks, the bleeding caused the bruising and swelling to extend from her hip, down her thigh and nearly to the posterior aspect of her knee.  For nearly a month, she had a painful, swollen bruise that covered nearly half of her upper leg.

83.     The experience in its entirety, including the injury to her leg, interfered with Ms. Infante's ability to sleep and perform her duties at work and other daily tasks.  Her overall quality of life diminished because of the traumatic nature of the experience and the extended period she spent in extreme pain.

84.     Ms. Infante is now afraid to attend peaceful protests and her First Amendment rights have been effectively chilled.

### *Plaintiff Cody Schmitt*

85.     Cody Schmitt is a resident of Colorado.

86.     On May 31, 2020, Mr. Schmitt attended the peaceful protests in Denver, Colorado, in the wake of the death of George Floyd.

87.     Around 9:45 p.m., as Mr. Schmitt was walking back to his vehicle from a candlelight vigil in Denver's Five Points neighborhood, he followed a large group of people marching in the same direction where his truck was parked.

88.     At Colfax and Logan, the police started closing in behind the group and shooting pepper ball bullets, baton rounds, tear gas, and flash-bang grenades.

89.     Mr. Schmitt was overcome by a heavy plume of tear gas which temporarily blinded him.  As he tried to follow the group, Mr. Schmitt lost his glasses.

90.     When Mr. Schmitt stopped to try to find his glasses, he was suddenly grabbed by a Denver Police Officer who handcuffed Mr. Schmitt and forcibly removed his respirator.  Another officer then sprayed Mr. Schmitt again with tear gas or pepper spray, thus blinding him again.

91.     Despite his request, the police officers refused to retrieve his glasses.

92.     The chemicals in his eyes coupled with the loss of his glasses caused Mr. Schmitt significant distress and disorientation.  Police officers continuously screamed at and berated him because he was unable to follow their directions.

93.     The police officers arrested Mr. Schmitt and charged him with curfew violation and failure to obey.

94.     After arriving at the jail, Denver Police Officers treated him aggressively, made threatening comments about remembering him and finding him after his release, placed him in over-crowded conditions at one point and isolation at another point, subjected him to sleep

deprivation, and made disparaging and harassing comments and epithets, such as "retard," "autistic," "faggot," "fairy," and "creep."

95.     After having a panic attack, he was transported to the psychology wing of the jail. He was seen by someone from Denver Health who prescribed medication, but no one provided the medication to him either during his incarceration or after his release.

96.     Mr. Schmitt had another panic attack the day after being released and he developed a nervous stutter.  Since the incident, Mr. Schmitt cannot speak without stuttering through sentences.

97.     As a result of this arrest and his experience at the jail, Mr. Schmitt also experiences severe anxiety and has been prescribed anxiety medications as a result.  Mr. Schmitt has been diagnosed with Post-Traumatic Stress Disorder.

98.     The charges against Mr. Schmitt were dismissed by the Denver City Attorney's Office.

99.     Because of this traumatic experience, Mr. Schmitt will no longer participate in peaceful protests because he fears he will again be targeted and physically assaulted by the police for his political beliefs.  Mr. Schmitt's First Amendment rights have been effectively chilled by the City of Denver.

### *Plaintiff Alex Wolfson*

100.    Alex Wolfson is a resident of Colorado.

101.    Mr. Wolfson was out skateboarding on Saturday, May 30, 2020, in downtown Denver, Colorado, near ongoing protests in the wake of the death of George Floyd.

102.     Mr. Wolfson road his skateboard closer to observe the protests out of curiosity, but he was not participating in the protests.

103.     Mr. Wolfson observed Denver Police Officers using tear gas against protestors, and he could smell the gas and feel its burn.

104.     At approximately 7:45 p.m., Mr. Wolfson left the protest area and started home on foot, carrying his skateboard.

105.     When Mr. Wolfson reached the Denver Post Office on the corner of West Colfax Avenue and Cheyenne Place, he was suddenly and without any warning shot in his right eye with a hard projectile fired by Denver Police Officers who were standing across the street on East Colfax Avenue.

106.     Mr. Wolfson fell to the ground as his right eye and surrounding area swelled and bled profusely.

107.     Mr. Wolfson lost sight in his injured eye and feared that he had lost his eye entirely.

108.     He struggled to make his way home alone, and when he arrived, he threw up several times before passing out from the pain, fear, and blood loss.

109.     As a result of this incident, Mr. Wolfson suffered severe damage to his right eye which required surgery to repair.

110.     Mr. Wolfson still experiences light sensitivity, and he has constant eye floaters that interfere with the clarity of his vision.

111.     Mr. Wolfson will never again go to or observe a peaceful protest in fear that he will be targeted and assaulted by the police for his perceived political beliefs.  Mr. Wolfson's First Amendment rights have been effectively chilled.

***Factual Allegations Relating to The City of Denver's Customs, Policies, Practices,
Procedures, Supervision, and Training***

112.    The protests against police brutality that were going on in Denver during the relevant time period started on or about May 28, 2020 and continued almost daily into the middle of June.  Additional protests and demonstrations occurred on a smaller scale into the month of July 2020.

113.    In response to the protests, the City, through its law enforcement agency, the DPD, dispatched its officers and officers from other agencies and jurisdictions into the streets of the City. These officers were outfitted in protective riot gear and were armed with "less-lethal" munitions, including chemical sprays (tear gas and pepper spray) and hard potentially injurious projectiles, such as flash-bang grenades, pepper balls, rubber bullets, and other kinetic impact projectiles ("KIPs"), that can be loaded into a gun or "launcher," aimed, and fired with precision at any target.

114.    At or near the beginning of the protests, one Denver Police Officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

115.    According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020—just months before being assigned to the protests.

116.    Other DPD officers were found to have used inappropriate force during the protests, including Officers Diego Archuleta and Derek Streeter.  Officer Archuleta, who had been with the DPD for four (4) years as of May 2020, had only received one (1) hour of crowd control training during his time at the Academy.

117.    Both Officers Archuleta and Streeter were disciplined for failure to distinguish between individuals participating in illegal activity and those merely verbalizing or expressing discontent with police.

118.    The Denver Office of the Independent Monitor ("OIM") issued a detailed report concerning the DPD's response to the 2020 protests.

119.    The OIM report cited observations of DPD officers using less-lethal munitions in troubling ways, specifically including the following:

a.    Deploying pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance;

b.    Deploying pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin; and

c.    Continuing to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area.

120.    The OIM report found that there was no guidance for high-risk explosive devices, such as rubber-ball grenades and noise-flash diversionary devices ("NFDDs"), and it identified inappropriate and/or insufficient standards for the use of pepper ball projectiles or "direct-fired" pepper balls.  Specifically, the report found that the DPD has only one standard for using such pepper balls—defensive resistance—which is defined in the crowd control context as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."  The report continued, "This means that an officer may strike a person directly with pepper ball in response to nothing more than disrupting traffic.  We believe that this standard is too low for direct-fired pepper ball use."

121.    In light of these findings, the OIM report made the following recommendations: that the DPD disallow the use of rubber-ball grenades during crowd control operations; that the DPD articulate clear and specific standards for when rubber-ball grenades and NFDDs may be used; that the DPD revise its standards for pepper ball use; and that direct-fired applications of pepper balls be limited only to circumstances in which a person displays active or aggravated active aggression.

122.    The OIM report found that not all officers using projectile launchers, including pepper ball and 40mm launchers, were trained and certified in using such weapons, and it recommended that the DPD implement standards to specify and ensure that only authorized officers may use such weapons during crowd-control events.

123.    With respect to mutual aid/assistance from other jurisdictions, the OIM report found that officers from other jurisdictions had used the following types of weapons and ammunition against protesters:  (1) at least 73 rounds of rubber-ball projectiles/pellets; (2) more than 150 "less-lethal" shotgun rounds, which can be aimed and fired like traditional shotguns and which can also be mistakenly loaded with and fire lethal ammunition; and (3) more than 200 rounds of "beanbags" filled with lead shot.

124.    While there was no reported use of such weapons/ammunition by officers directly employed by the DPD, the Use of Force Policy and Crowd Management Manual of the DPD did not address their use one way or the other.

125.    The OIM report not only recommended that the DPD develop agreements, procedures, and command control structures for working with other jurisdictions, but also that the

DPD require its mutual aid partners to adhere to DPD's policies and use only the weapons and ammunition approved by the DPD.

126.    The OIM report also found problems with internal tracking and logging of the use of less-lethal weapons during crowd control events; insufficient requirements and policies regarding the wearing and use of body cameras during such events; insufficient supervision and review of officers and corresponding use of force during crowd control operations; failure of officers and supervisors to issue dispersal orders before using force to disperse crowds; lack of sufficient enforcement regarding the prominent display of officers' badge numbers; and allowing untrained or insufficiently trained officers to use "less-lethal" weapons, including pepper ball guns, and corresponding launchers, and other projectile weapons during crowd control operations

127.    A full copy of the OIM report, which was released to the public, is attached hereto and is incorporated by reference herein as Exhibit 1.

128.    The DPD's failure to train officers, implementation of inappropriate policies and its failure to implement other policies and standards as set forth in the OIM report not only resulted in injuries to the Plaintiffs, but also similar injuries to many other individuals who were participating, observing, or otherwise near the protests in Denver in late May through June/July of 2020.  Many of these other injured persons are parties to other federal lawsuits that have already been filed in the U.S. District Court of Colorado.

129.    Four plaintiffs filed an action against the City on June 4, 2020, *Abay v. City of Denver*, that was subsequently removed to the United States District Court for the District of Colorado, Civ. Action No. 20-cv-01616-RBJ, and included allegations that the City, through its DPD officers, used and condoned the use of excessive force tactics against peaceful protestors,

members of the media, and even third-parties in the vicinity of the protesters to punish them for demonstrating against police brutality and with the intention and/or effect of discouraging their and others' First Amendment right to free speech and expression.

130.    The *Abay* action resulted in the issuance of a temporary restraining order restricting the officers "from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrations … unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed."  *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D.Colo., June 5, 2020).

131.    Around the same time, the City's Executive Director of Safety, Murphy Robinson, sent a memorandum to Chief of Police, Paul Pazen, that referred to the recent protest activities and serious injuries caused by pepper balls and sponge-tipped rounds fired by 40mm launchers.  Mr. Robinson requested that the City immediately consider prohibiting the use of 40mm launchers against any individuals in a crowd during any upcoming protests, that there be an internal review to determine whether such launchers are appropriate for crowd control, and that all DPD officers authorized to use pepper balls be reminded of their training, including that pepper balls may only be fired at the ground and not into a crowd of protesters.  A copy of this memorandum is attached hereto and incorporated by reference herein as Exhibit 2.

132.    However, the Defendant Officers continued to indiscriminately use such weapons against protesters in defiance of the Court's Order and the Director of Safety's requests, and the

Defendant City continued to condone and ratify these actions through inaction for the duration of the protests, which continued through the summer.

133.    The allegations on which the restraining order was based are consistent with the attitude expressed in the now-terminated DPD officer's Instagram post and the findings of the OIM report that a policy, practice, and/or custom existed in the DPD that condoned or was callously indifferent to the use of unnecessary and excessive force by its officers against its own citizens.

134.    In fact, just days before the federal judge issued the restraining order, the City's leaders and decision-makers, including Denver Mayor Michael Hancock and Denver Police Chief Pazen, publicly praised the DPD officers' use of force to handle the protests, which not only ratified their unconstitutional conduct, but also demonstrated the City's indifference to violations of the constitutional rights of protesters by DPD Officers.

135.    Furthermore, even if the City had written policies against the use of unnecessary and excessive force, guidelines for crowd control and dispersal, safety guidelines for using less-lethal munitions and chemicals, and/or guidance related to recognizing and respecting constitutional rights, the City's failure to adequately train its officers on these matters, as evidenced by the Instagram posting by a recently trained DPD officer, the lack of sufficient training in crowd control tactics of a 4-year veteran of the DPD (Officer Archuleta), and the findings and recommendations of the OIM report, demonstrates deliberate indifference toward the constitutional rights of persons with whom its officers come into contact.

136.    The City of Denver arrested and charged hundreds of protesters with criminal violations.  However, the City dismissed hundreds of criminal charges before the defendant protesters ever had their first appearance in Court.  This demonstrates that the City did not arrest

the protesters because they had committed criminal violations, but rather as a means of quelling their protected First Amendment activities and punishing them for the same.  This enacted policy of "mass arrests" has repeatedly been held unconstitutional and is a violation of clearly established law.

137.    The policy, custom, and/or lack of training that has led to the DPD's use of unnecessary and excessive force pre-existed the incidents involving the Plaintiffs.  This policy, custom, and/or lack of training applies to the unconstitutional treatment of individuals by DPD officers, as well as unconstitutional treatment of groups of protestors.

138.    In October 2011, DPD officers used "less lethal" munitions, including tear gas and pepper balls, against protesters involved in the "Occupy" demonstrations.  At least one civilian was struck in the face.   Despite recommendations of the OIM that the DPD employ its Tactics Review Board ("TRB") to assess the tactics used during the clash with demonstrators, including compliance with existing policies and procedures, and the need for any revisions to such policies and procedures, related training, and recommendations for crowd control tactics to improve outcomes for future demonstrations, the City declined to accept those recommendations.

139.    In January 2017, the OIM again highlighted several noteworthy deficiencies in the DPD's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

140.    There are dozens of additional documented claims and lawsuits against the City and/or its police officers going back well over ten years in which the City either paid settlements

or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations.  Recently, Attorney David Lane compiled a list of just some of those incidents as an exhibit to a Complaint against the City of Denver captioned *Naphtali et al v. City and County of Denver,* Case No. 1:20-cv-02198.  Plaintiffs have attached and incorporated by reference herein a version of Mr. Lane's exhibit, with his permission, as Exhibit 3.

141.    In addition to the unlawful mass arrests and the unlawful use of chemical and less-lethal munitions against groups of peaceful protesters, the City also implemented an unconstitutional curfew order that violated the rights of each Plaintiff.  On May 30, 2020, the Mayor of Denver declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening.  The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

142.    The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020, to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020, until 5:00 a.m. on June 1, 2020.

143.    On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020.

144.    During the curfew hours, "all persons" were "prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the

purpose of travel," with certain exceptions.  However, there was no exception for constitutionally protected First Amendment activity.

145.    A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

146.    The City's curfew was implemented by DPD officers to target peaceful protesters (or people believed to be or associated with such protesters), such as Plaintiffs, who were doing nothing more than exercising their First Amendment rights to express themselves, redress grievances, and to support, associate with, observe and/or document others who oppose racial injustice and police misconduct and brutality.

147.    Each of the Plaintiffs was directly impacted by this curfew order, either because they were unlawfully arrested on the basis of curfew violation or because their First Amendment rights were suppressed as a direct result of being unable to protest for fear of arrest.

148.    With respect to officers from other jurisdictions, the City invited officers from the City of Aurora Police Department ("Aurora PD") to assist with the City's response to the protests.

149.    A recent internal use-of-force review of the Aurora PD has revealed an extensive lack of training in many areas of policing, specifically including the constitutional limits of use of force and de-escalation tactics.  In addition, the report revealed underlying policies and customs where the use of force is permitted under any circumstances and without first attempting to de-escalate matters.

150.    The Defendant City, as a participant of past certification review processes of the Aurora PD, knew or should have known of these deficient policies, customs, and training before it invited Aurora PD officers to join and assist officers of the DPD in responding to the protests.

151.    If the City had clear policies and guidelines about the proper handling of peaceful demonstrations, crowd control, and the protection of constitutional rights, then the DPD officers and its agents would have known that they could not target or randomly use injurious weapons against peaceful protesters, such as Plaintiffs, who were not committing crimes or violating any laws.

### *Plaintiffs' Damages*

152.    As a direct and proximate result of the unconstitutional acts, including the use of excessive and unreasonable force against and/or the wrongful arrests of the Plaintiffs by officers and agents of the DPD, and the City's policies, practices, customs, and/or lack of supervision and training, which were the moving force and cause of the officers' misconduct, Plaintiffs have suffered injuries, damages, and losses, including without limitation physical injuries, pain and suffering, loss of enjoyment of life, humiliation, anxiety, mental and emotional distress, and fear of being shot, gassed, injured, arrested, charged, detained, and/or incarcerated for lawfully exercising their First Amendment constitutional rights to peacefully assemble, associate, express their opinions and beliefs, observe and document public events and demonstrations, and redress their grievances, particularly their opinions and beliefs about racial injustice and police brutality.

### CLAIMS FOR RELIEF

153.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

154.    The First Amendment of the United States Constitution protects the freedom of speech, association, expression, press, and the right of people to peacefully assemble and petition the government to redress grievances.

155.    The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and the use of excessive force in connection therewith.  When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

156.    The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive protections against arbitrary abuses of executive power.

157.    A municipality may be liable under 42 U.S.C. §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S.  378, 388-90 (1989).

158.    The City, through its Chief of Police, Paul Pazen, and Mayor Michael Hancock, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for adopting and implementing DPD policies and imparting such policies to DPD's police officers and agents acting on its behalf through training and supervision.

### FIRST CLAIM FOR RELIEF
**42 U.S.C. §1983 - Violation of Fourth Amendment of U.S. Constitution
Use of Unnecessary, Unreasonable and Excessive Force
(All Plaintiffs against All Defendants)**

159.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

160.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

26

161.   Plaintiffs had protected Fourth Amendment rights against being injured and victimized by the use of unnecessary and excessive force by law enforcement officers and against being arrested without probable cause or other lawful justification.

162.   A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally restrains the freedom of a person to simply walk away, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), by means of physical force or a show of authority, *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008).  Even an unintended person is "seized" if such person is an object of the detention.  *Browar v. County of Inyo*, 489 U.S. 593, 596 (1989).

163.   Whether the force used by police officers is unreasonable and thus excessive is determined by an objective analysis of the facts and circumstances that existed at the time the force was applied, including the severity of the suspected crime, whether an immediate threat was posed to the safety of the officers and others, and whether the suspect was actively resisting or evading arrest.  *Fogarty*, 523 F.3d at 1159-60.

164.   Reasonable officers at the time of the actions alleged herein would have been on notice that using the previously alleged munitions or "any other type of pain-inflicting compliance technique" may constitute excessive force if applied under circumstances that failed to warrant such use of force.  *Fogarty*, 523 F.3d at 1161-62.

165.   The Defendant Officers violated Plaintiffs' rights to be free from excessive and unreasonable force and unreasonable seizure when they used "less-lethal" weapons, kettled, and/or arrested Plaintiffs without any lawful justification.

166.   The Defendant Officers used unreasonable and excessive force in indiscriminately using "less-lethal" weapons against the Plaintiffs, or alternatively, in specifically targeting certain

Plaintiffs to suppress their perceived expressive activity, and not based on an individualized determination of individual conduct justifying such force, in violation of the Fourth Amendment.

167.    The Defendant Officers had no legal justification to attack and/or seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

168.    The Defendant Officers engaged in these actions intentionally, willfully, and wantonly, and demonstrated deliberate indifference to and reckless disregard for Plaintiffs' constitutionally protected rights.

169.    The Defendant City has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

170.    Final policymakers for the City, including Chief Pazen and Mayor Hancock authorized the actions of the Defendant Officers and/or ratified their actions after-the-fact.

171.    The misconduct of the Defendant Officers was undertaken pursuant to the policies, practices, and customs of the City.

172.    The City's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiffs' constitutional rights.

173.    The City failed to properly supervise and/or train their police officers, specifically including the Defendant Officers.

174.    The need for policies, training, and supervision of officers on how to properly handle non-violent protesters and demonstrations was so obvious and lacking and so likely to result

in the violation of constitutional rights, that the Defendant City and its policymakers, including Chief Pazen and Mayor Hancock, were deliberately indifferent to the need.

175.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourth Amendment Rights.

176.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

177.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourteenth Amendment of U.S. Constitution**
**Violation of Rights of Due Process and Equal Protection**
**(All Plaintiffs against all Defendants)**

178.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

179.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

180.    The Defendant Officers violated the Plaintiffs' rights to due process and equal protection under the Fourteenth Amendment by indiscriminately attacking them with gas/chemical and other less-lethal weapons, or by specifically targeting and attacking certain Plaintiffs and/or arresting them for violating the curfew, peacefully protesting, or otherwise lawfully exercising their First Amendment rights.

181.    The Defendant Officers' conduct was deliberately indifferent to the Plaintiffs' rights, shocks the conscience, and violated the decency of civilized conduct under the Fourteenth Amendment.

182.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

183.    In particular, the City issued a curfew order that was unconstitutionally applied to protesters (actual or perceived).  While the curfew made exceptions for persons engaged in certain lawful conduct, it did not do so for persons lawfully engaged in activities protected by the First Amendment.

184.    This curfew order prompted the Defendant Officers to target and arrest persons, such as Plaintiff Schmitt, for doing nothing other than participating in activities protected by the First Amendment while not arresting persons who violated the curfew but were not protesting.

185.    As previously alleged, the Defendant City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

186.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourteenth Amendment Rights.

187.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

188.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of the First Amendment of the U.S. Constitution**
**Infringement of Free Speech, Assembly, Association and/or Press**
**(All Plaintiffs against All Defendants)**

189.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

190.    At all relevant times, the Defendants acted under color of state law, and Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

191.    Plaintiffs had protected First Amendment rights to express their viewpoints and support by attending peaceful protests to redress grievances against racial injustice and police

misconduct/brutality, to assemble and associate with other peaceful protesters, and/or to record and document such public protests and the public response by the police to such protests.

192.    As previously alleged, Plaintiffs were peacefully protesting or otherwise associated with the peaceful protests by observing, documenting, or being in the area where peaceful protests were occurring at the time they were attacked and/or arrested by the Defendant Officers.

193.    As previously alleged, there was no lawful reason or justification for attacking and/or arresting them.

194.    The Defendant Officers violated the Plaintiffs' First Amendment rights by targeting them as protesters or perceived protesters and attacking and/or arresting them for expressing perceived viewpoints and/or ostensibly for violating an unconstitutionally applied curfew.

195.    The Defendant Officers violated the Plaintiffs' First Amendment rights by attacking and/or arresting them to suppress, punish, or retaliate against Plaintiffs for peacefully expressing their viewpoints or otherwise for their association with and support for the peaceful protests.

196.    As previously alleged, the City had issued a curfew that provided no exceptions for activities protected by the First Amendment.

197.    Accordingly, the City adopted an official policy of targeting and arresting only protesters during the curfew hours and not non-protesters.  This was intended to further suppress Plaintiffs' protected First Amendment activities, including the right to free speech, expression, and assembly, and it violated the First Amendment.

198.    As previously alleged, the Defendant Officers violated Plaintiffs' First Amendment rights by attempting to "control" and break-up peaceful protests by using "less-lethal" weapons

against and/or kettling the Plaintiffs without issuing warnings or dispersal orders, giving adequate time to disperse, or any lawful justification whatsoever.

199.    These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' First Amendment rights.

200.    Furthermore, the right to document information is grounded in the Free Speech and Petition Clauses of the First Amendment if the purpose of documenting the information is to use it to petition the government for redress of grievances.  The right to document information is also grounded in the Free Press Clause if the purpose is to publish and disseminate it to other people.

201.    The First Amendment right to document and disseminate information includes the right to photograph, audio- and video-record police officers performing their duties in public, as well as the right to photograph, audio- and video-record demonstrations.

202.    Police officers, such as the Defendant Officers, who are performing their public duties in public places have no reasonable expectation that their conduct is private and that it will not be recorded, documented, published, and disseminated.

203.    The Defendant Officers' actions in using "less-lethal" weapons against those Plaintiffs who were recording or documenting police officers performing their public duties in public places violated the First Amendment rights of those Plaintiffs.

204.    The Defendant Officers' actions in using "less-lethal" weapons against those Plaintiffs who were peacefully protesting or otherwise associated with peaceful protesters to control and suppress their speech violated the First Amendment rights of those Plaintiffs.

205.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training

and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

206.    As previously alleged, the Defendant City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

207.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' First Amendment Rights.

208.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

209.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourth Amendment of U.S. Constitution**
**Unlawful Arrest**
**(Plaintiff Schmitt against All Defendants)**

210.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

211.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

212.    Plaintiff Schmitt was arrested by one or more of the Defendant Officers who cannot be identified until the arrest records are released.  Plaintiffs have requested the records for Mr. Schmitt's arrest, but the City has refused to comply with its obligations under the Colorado Open Records Act and the Colorado Criminal Justice Records Act.  The City's refusal to follow the open records law demonstrates their commitment to flouting the law with regard to Mr. Schmitt and other protesters.

213.    Plaintiff Schmitt's arrest was made without probable cause that he had violated any law.

214.    The criminal charges against Mr. Schmitt were unconditionally dismissed.

215.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiff Schmitt's rights.

216.    As previously alleged, the City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiff Schmitt and others like him.

217.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct that violated Plaintiff Schmitt's Fourth Amendment Rights.

218.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the arrests and use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would act within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained actions by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

219.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiff Schmitt's constitutional rights were violated, and he suffered injuries, damages, and losses as previously alleged above.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, jointly and/or severally, as follows:

a.  General and compensatory damages in an amount that will fully and fairly compensate Plaintiffs for their injuries, damages, losses, and violation of their federal constitutional rights available pursuant to 42 U.S.C. §1983 and any other applicable federal law;

b.  Pre- and post-judgment interest;

c.  Reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable law; and

d.  Declaratory and injunctive relief, as appropriate;

e.  Issuance of an Order mandating appropriate equitable relief, including but not limited to:

(i)  The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

(ii) Imposition of appropriate disciplinary action against employees of the City;

(iii)Mandatory training designed to avoid future similar misconduct by Defendants;

f.   Such other and further relief as the Court deems proper and just.

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 13th day of September, 2021.

Respectfully submitted,
BEEM & ISLEY, P.C.

*s/ Clifford L. Beem*
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 17th St., Ste. 850
Denver, CO 80202
Phone: (303) 894-8100
Fax: (303) 894-8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net


BAUMGARTNER LAW, L.L.C.

*s/ S. Birk Baumgartner*
S. Birk Baumgartner
Adam R. Yoast
300 E. Hampden Ave., Ste. 4041
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
birk@baumgartnerlaw.com
adam@baumgartnerlaw.com
*Counsel for Plaintiffs*

Plaintiffs' Addresses:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Suite 4041
Englewood, CO 80113
Phone: (720) 626-9418